UNITED STATES of America,
Appellee,

v.

Aubrey Linwood GOSS, Horace Fletcher Goss, Nathaniel Presley Davis, and Robert Earl Cox, Appellants.

No. 9087.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 18, 1963.

Decided March 5, 1964.

R. Roy Mitchell, Jr., Durham, N. C., for appellants Horace Fletcher Goss and Robert Earl Cox.

Jerry L. Jarvis, Durham, N. C., for appellant Aubrey Linwood Goss.

Irvin B. Tucker, Jr., Raleigh, N. C., for appellant Nathaniel Presley Davis.

Roy G. Hall, Jr., Asst. U. S. Atty., and William H. Murdock, U. S. Atty., for appellee.

Before HAYNSWORTH and BRYAN, Circuit Judges, and FIELD, District Judge.

ALBERT V. BRYAN, Circuit Judge.

Conspiracy[1] to violate the revenue laws[2] relating to possession, concealment, transportation and distilling of whiskey was charged to the appellants Aubrey Linwood Goss, Robert Earl Cox, Nathaniel Presley Davis and Horace Fletcher Goss in a one-count indictment of them and others in the Federal Court for the Middle District of North Carolina. The plot alleged continued from May 31, 1960 until March 1, 1962. Of seven convicted only these four appeal.[3] The primary error assigned is a prejudicial variance between the indictment and the proof in this: a single conspiracy was charged while the evidence revealed multiple conspiracies without a common interest or common confederates. By way of corollary, it is added that the variance exposed a misjoinder of offenses and defendants in the indictment.

We find the assignment true, the error fundamental and fatal.

The indictment named 25 conspirators in all, of whom only 10 were accused as defendants. The conspiracy was laid as committed not only in the Middle District of North Carolina but in the Eastern District as well—Lee and Durham Counties in the Middle, and Wake, Granville and Franklin in the Eastern. The Government's proof consisted of evidence of six principal events with interstitial proof of acquaintance and association among some of the accused. It pointed up appellant Aubrey Linwood Goss (Aubrey) as the archconspirator.

1. The first incident occurred May 31, 1960. Two men, Henry Tapp and William Cameron, were arrested for transporting 90 gallons of untaxpaid spirits within Durham County in a 1952 Ford automobile owned by Aubrey. No charges were placed against Aubrey at the time. Following their release the two men went to Aubrey's home and that night were found sleeping there in an automobile belonging to one of them. *These two never again appear in the evidence.*

2. *Seven months later*, on January 10, 1961, Aubrey "convoyed" a truck load of sugar in Durham County along U. S. Highway 70. The two vehicles turned off together, but Aubrey's car immediately returned to the highway via a loop road. In a few minutes he left the highway again, going in the direction from which he had reappeared. The Government agents lost sight of both the truck and Aubrey's car, but subsequently that night the truck was seen travelling empty.

Near where the truck and Aubrey had been spotted and behind a dwelling just off the loop road, two stills were found on January 24, 1961 in an outbuilding within the curtilage of the house. This

---

1. 18 U.S.C. § 371.

2. 26 U.S.C. §§ 7206(4), 5173(a), 5179(a), 5601(a), 6504(a), and 5205(a).

3. "Defendant" is herein used to denote one who was accused and acquitted or convicted but not now appealing. "Appellant" is used to designate an accused who was convicted and is now appealing. Those having neither of these descriptions were unaccused but named conspirators.

was the Lake Nemo vicinity. Arrested were the appellant Cox, defendant Taylor and Oscar Tapp (another Tapp), an unaccused conspirator. Tapp was seen about a month later at Aubrey's home.

3. March 10, 1961 in the Holly Springs neighborhood of Wake County another distillery was found. Arrested at the site were appellant Cox, defendant Taylor and conspirator Oscar Tapp, all of whom were at the Lake Nemo still. In addition, appellant Horace Fletcher Goss, Aubrey's nephew, with a fellow-plotter was apprehended trying to escape. The next week a Government agent observed Horace along with defendant Taylor conversing with Aubrey in his yard. Taylor and Horace fled on sight of the agent. *Horace is not shown to have participated at any other time in unlawful conduct. Cox and Taylor do not appear in the testimony again.*

4. *Four months afterwards*, on July 1, 1961, a third illegal still operation was located in the Deep River section of Lee County. On July 2, 1961, a 1952 Buick, which in March had been seen at the residence of defendant Taylor, was observed leaving the still site. It returned early the next day and that evening a truck convoyed by Aubrey in a 1954 Ford entered the access road to the still. Soon this truck left the still but both the truck, and the Ford driven by Aubrey, were stopped a few miles away. Fifteen barrels of untaxpaid liquor were discovered in the truck. *This was Aubrey's last proven act of complicity,* although in October he boasted that whiskey was his business.

5. *Four months later*, on November 3, 1961, in Granville County a fourth still operation was uncovered. The still had been moved on the previous day to escape a fire in adjacent woods and is designated in the record as "the burned out still". Defendant Walters and two other persons were arrested at this still.

6. The last scene introduces the appellant Davis and defendant Ray. *Neither of them was shown as an accomplice in any of the prior episodes.* It began in October 1961 when Davis was driving his automobile on a public highway with Aubrey and defendant Ross as passengers. After the car was stopped by officers, Aubrey identified himself as Frank Williams, Davis all the while appearing quite nervous.

Through October, November and December 1961, defendant Ray bought a total of some 65,000 fruit jars. On November 9, 1961 Davis bought a van type truck owned by the Carolina Storage Company (the Carolina truck). In December 1961 Ray after purchasing fruit jars and approximately 20,000 pounds of sugar hauled them away in the Carolina truck. Its license number was DZ 397, which had nine months previously been identified as defendant Taylor's, one of the men arrested at the Lake Nemo and Holly Springs stills. §§ 2 and 3 supra. On December 4, 1961 this truck, loaded by defendant Ray with fruit jars, was followed to the "Cheek Farm". The next day it was seen there carrying another license tag. A fifth still, known as the Cheek Farm still, was located a short distance away.

On December 8, 1961 Davis convoyed the Carolina truck while it was heavily loaded and driven by defendant Ray. On the same date Ray had purchased 10,000 pounds of sugar and hauled it away in this truck. On January 10, 1962 Ray was arrested with 3600 fruit jars on the same truck. The Cheek Farm still was raided and destroyed on February 8, 1962.

The events in this, § 6, scene are denominated the "material conspiracy", inasmuch as they comprised only the possession and transportation of materials, for the manufacture of distilled spirits. The statute relating to materials, 26 U.S.C. § 5686(a), is not cited in the indictment as transgressed in the conspiracy.

█ The evidence taken as a whole, we think, manifests at best a series of separate and unconnected conspiracies. Appellant Cox appears in only two of the six incidents. Appellant Horace Goss

in one and appellant Davis in another. Even appellant Aubrey was placed in but four. With the exception of events 2 and 3, the episodes are so far apart and so differently peopled as to destroy any semblance of relationship. Certainly the evidence proves many instances of crime but not the unitary scheme the indictment depicts.

Such a variance, at the same time constituting a violation of the joinder allowable under Rule 8(b) Fed.R.Crim. P., vitiates the convictions of all the appellants under the principles enunciated in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Indeed, that decision precisely prescribes a blueprint for decision here; it reads directly upon our case.

There the defendants allegedly contrived conspiratorially to obtain Federal Housing Administration insurance upon fraudulent loan applications. Simon Brown, somewhat like Aubrey here, was "the common and key figure of all of the transactions proven". The other defendants "had transacted business with Brown relating to * * * [the] loans, [b]ut no connection was shown between them [and the appealing defendants] other than that Brown had been the instrument in each instance for obtaining the loans". There were eight or more such instances. The indictment charged a single conspiracy. The Government urged that even if there were more than one conspiracy proved, the variance was not prejudicial. The argument was rejected, the conviction under the indictment vacated. The present case is of the same factual pattern and suffers the same legal infirmity.

A plurality of conspiracies was recognized by the District Judge, for he instructed the jury in regard to their duty should they find that "two or more conspiracies have been proved". The prosecuting attorney, in his frank argument before us, tacitly acknowledged the proof made out more than one conspiracy. He denies that the variance is fatal because,

as was also argued in Kotteakos, the difference was not prejudicial to the accused, their guilt of some conspiracy being too plain to warrant thought of prejudice. But this position cannot prevail.

To begin with, the Government's position admits the absence of an indispensable ingredient of a conspiracy: that the accused persons must have had a common aim. United States v. Zuideveld, 316 F.2d 873, 878 (7 Cir. 1963). If there were conspiracies here, the object of all the offenders, save Aubrey, was not the same, for the object of one group was not always the object of another. The only thing in common was the law they were breaking. Consequently, the single conspiracy of the indictment falls apart when the conduct of the defendants is seen to consist of several instead of a sole combination. As the Court pointed out in Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947) in distinguishing the Kotteakos case and, in effect, our case:

"Apart from the much larger number of agreements there involved [Kotteakos], no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific ob-

ject and result. There was no drawing of all together in a single, overall, comprehensive plan."

■ The obviousness of the criminalness of the defendants' behavior cannot be allowed to obliterate the prejudice arising from the failure of the misconduct to sustain the special nature of the particular charge. Justice Rutledge posed the Government's analogous contention in Kotteakos v. United States, supra, 328 U.S. at 767, 771, 66 S.Ct. at 1249, 1251, 90 L.Ed. 1557:

"The Government's theory seems to be, in ultimate logical reach, that the error presented by the variance is insubstantial and harmless, if the evidence offered specifically and properly to convict each defendant would be sufficient to sustain his conviction, if submitted in a separate trial.

\* \* \* \* \* \*

"Again the basis is that because the proof was sufficient to establish the participation of each petitioner in one or more of several smaller conspiracies, none of them could have been prejudiced because all were found guilty, upon such proof, of being members of a single larger conspiracy of the same general character."

Speaking further to the subject, Justice Rutledge said 328 U.S. at 775, 66 S.Ct. at 1253, 90 L.Ed. 1557:

"With all deference we disagree with that conclusion and with the ruling that the permeating error did not affect 'the substantial rights of the parties.' That right, in each instance, was the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others as shown by this record."

In our view the number of possible conspiracies and conspirators here puts the case beyond the scope of Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). There, as the Court emphasized in Kotteakos, only two conspiracies were proved, only four persons involved, and "[t]he sheer difference in numbers, both of defendants and of conspiracies proven, distinguishes the situation." The same conclusion was reached in Rocha v. United States, 288 F.2d 545, 552 (9 Cir.), cert. denied, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961).

The Kotteakos opinion also explains the peril to defendants in the charge to the jury when the evidence reveals more than one conspiracy under a single-count indictment. This threat of injury was advanced by the Court as another reason why the variance was prejudicial. But we need not further discuss it for such danger to the appellants can be avoided in the new trial we authorize.

■ Finally, the variance also proved the joinder of the parties and offenses in this indictment improper, as not coming within the permissions of Rule 8(b), Federal Rules of Criminal Procedure. See Ingram v. United States, 272 F.2d 567 (4 Cir. 1959). Of course, the District Judge could not be aware of the violation of the Rule until the Government had completed all of its evidence, for the defect was not apparent from the indictment. But then he could look to Rule 14, drawn to relieve the prosecuted and prosecutor from prejudice by joinder. Under the latter Rule the Court should have, on the motion of the appellants, ordered an election by the Government of the conspiracy it would prosecute, directed a severance of defendants and offenses with prosecution of the participating defendants for the single offense and subsequent separate trials of the other offenses and offenders; or ordered another trial altogether, as it deemed necessary to save the appellants from prejudice.

Both the assignment of error in regard to the argument of the United States Attorney and the one attacking the validity of the search and seizures in the Lake Nemo incident, we find without merit. The question of the jurisdiction of the Court of one or more of the incidents, because occurring in the ad-

joining district, as well as the remaining assignments on this appeal, can be more readily and intelligently resolved by the trial court if and when the prosecution is resumed.

The judgments of conviction must be set aside, and the case remanded to the District Court for proceedings not inconsistent with this opinion.

Reversed and remanded.